IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Center for Biological Diversity**, a non-profit organization; **Save Our Springs Alliance**, a non-profit organization;<br><br>Plaintiffs,<br><br>v.<br><br>**Texas Department of Transportation**; **James Bass**, Executive Director of Texas Department of Transportation;<br><br>Defendants. | Case No. 1:16-cv-876<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiffs Center for Biological Diversity ("the Center") and the Save Our Springs Alliance ("SOS") challenge the failure of Defendant Texas Department of Transportation and its director, Defendant James Bass (collectively "TxDOT"), to comply with section 7 of the Endangered Species Act ("ESA") and its implementing regulations. Specifically, TxDOT has failed to ensure through completed Section 7 consultation that the MoPac Intersections Improvements Project ("Intersections Project") —a two-mile long highway project in Travis County—does not jeopardize the survival of the federally endangered Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler.

2. Interagency consultation is a central feature of the ESA's framework for protecting endangered and threatened species. Through the consultation process, federal agencies work with expert federal wildlife agencies to ensure that their actions do not jeopardize the survival of threatened or endangered species.

3. Through this Complaint, Plaintiffs seek injunctive and declaratory relief, including an order compelling TxDOT to complete the required consultation and enjoining construction on the Intersections Project until consultation is completed.

## JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 23 U.S.C. § 327(c)(3)(B) and Tex. Transp. Code § 201.6035 (consent to federal jurisdiction and waiver of sovereign immunity), 16 U.S.C. § 1540(g)(1)(A) (ESA citizen suit provision) and 5 U.S.C. § 702 (Administrative Procedure Act).

5. Plaintiffs provided Defendants with at least 60 days notice of the ESA violations alleged herein as required by 16 U.S.C. § 1540(g)(2)(A). Defendants have not remedied the violations set out in that 60-day written notice.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 16 U.S.C. § 1540(g)(3)(A) because defendants reside there and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

7. Plaintiff **Center for Biological Diversity** is a non-profit 501(c)(3) organization with more than 50,000 active members, with offices in Tucson, Arizona, and elsewhere across the country. The Center and its members are concerned with the conservation of imperiled species—including the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler—and with the effective implementation of the ESA.

8. The Center's members include those who have visited areas where the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler are known to occur. They use these areas to try to observe the endangered salamanders and warbler and other wildlife; for research; for photography; for aesthetic enjoyment; and for recreational and other activities. The Center's members derive professional, aesthetic, spiritual, recreational, economic, scientific and educational benefits from these listed species and their habitats. Those members have concrete plans to continue to travel to and recreate in areas where they can try to observe the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, and they will continue to maintain an interest in these species and their habitats in the future. The Center petitioned to list the Austin blind salamander under the ESA in 2004.

9. Plaintiff **Save Our Springs Alliance, Inc.,** is a nonprofit charitable corporation established in 1992 to protect the land, water, and wildlife of the Edwards Aquifer region and the natural and cultural heritage of the Texas Hill Country. SOS and its members engage in a range of outdoor education, conservation-oriented research, and conservation advocacy activities—including, among others, filing written comments in the environmental study processes for the Intersections Project. SOS members regularly swim in Barton Creek and Barton Springs; hike and bike on the Barton Creek greenbelt and Lady Bird Lake trail directly below and adjacent to MoPac; and enjoy Zilker Park, Lady Bird Lake, and other parks and preserves along the MoPac South corridor. SOS members include scientists and citizen scientists who study and work to protect the endangered Barton Springs and Austin blind salamanders and golden-cheeked warbler. SOS members petitioned to list the Barton Springs salamander as endangered. One SOS member owns 385 acres adjacent to the Intersections Project and manages that property for purposes of conservation of water and wildlife.

10. Defendants' failure to ensure against jeopardy through completion of consultation on the Projects' impacts to the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler—and thereby ensure their survival is not jeopardized—has adversely affected and continues to adversely affect Plaintiffs and their members' interests. If TxDOT completed consultation as required, 16 U.S.C. § 1536(a)(3), FWS would detail how the Intersections Project affects the endangered species and their habitats, and if necessary, it would suggest reasonable and prudent alternatives to protect the species. § 1536(b)(3)-(4).

11. Unless the requested relief is granted, Plaintiffs' interests will continue to be adversely affected and injured by the agency's failure to complete consultation on the Intersections Project, as well as the resulting harm to the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler and their habitats if Defendants are allowed to begin construction of the Intersections Project without completing consultation. These are actual, concrete injuries from which Plaintiffs and their members presently suffer, and they are directly caused by the agency's failure to complete consultation and ensure the Intersections

Project does not affect these listed species. The relief sought herein—an order compelling completion of consultation and enjoining construction on the Intersections Project until the agency brings itself into compliance with law—would redress Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law.

12. Defendant **Texas Department of Transportation** is a state agency with principal executive offices located at 125 East Eleventh Street, Austin, Texas, 78701. In December 2014, the State of Texas and TxDOT entered into a formal memorandum of understanding with the Federal Highway Administration ("FHWA") establishing that, for transportation-related actions that are the subject of this lawsuit, TxDOT is acting in the capacity of a federal agency, specifically as FHWA.

13. Defendant **James Bass** is the Executive Director of TxDOT. He is sued in his official capacity as the TxDOT Executive Director.

## LEGAL BACKGROUND

**Endangered Species Act**

14. Congress enacted the ESA, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved … [and] a program for the conservation of such endangered species and threatened species …." 16 U.S.C. § 1531(b).

15. The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior. The Secretaries of Commerce and Interior have delegated this responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service ("FWS"), respectively.

16. When a species has been listed as threatened or endangered under the ESA, all federal agencies—including TxDOT as a delegate of FHWA—must ensure that their programs and activities are in compliance with the ESA.

17. To this end, Section 7(a)(2) of the ESA requires that "each federal agency shall, in consultation with and with the assistance of [FWS], insure that any action authorized, funded, or

carried out by such agency (hereinafter … "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by [FWS] … to be critical." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

18. An agency must initiate consultation under Section 7 whenever its action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). Conversely, an agency is relieved of the obligation to consult on its actions only where the action will have "no effect" on listed species or designated critical habitat. "Effects determinations" are based on the direct, indirect, and cumulative effects of the action when added to the environmental baseline and other interrelated and interdependent activities. 50 C.F.R. § 402.02 (definition of "effects of the action").

19. The scope of agency actions subject to consultation is broadly defined to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies …." 50 C.F.R. § 402.02 (definition of "action").

20. An agency is required to review its actions "at the earliest possible time" to determine whether an action may affect listed species or critical habitat. 50 C.F.R. § 402.14(a). To that end, FWS is required to conclude consultations within 90 days. 16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. §§ 402.14(e).

21. Section 7(d) of the ESA, 16 U.S.C. § 1536(d), provides that once a federal agency initiates consultation on an action under the ESA, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation. Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to the species or adverse modification of its critical habitat.

22. To initiate consultation, the action agency (here, TxDOT) must assess the impacts of the action on listed species and their habitat and provide all relevant information about such impacts to the expert wildlife agency (here, FWS). 50 C.F.R. § 402.14(c)-(d). If the action agency determines that an action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, and if FWS concurs in writing with that determination, the agency does not have to undergo formal consultation. 50 C.F.R. §§ 402.13, 402.14(b).

23. If FWS does not concur, or if the action agency has determined that the action is "likely to adversely affect" a listed species, the agencies must conduct a formal consultation. *Id.* at § 402.14(a).

24. The end product of formal consultation is a biological opinion in which FWS determines whether the agency action will jeopardize the survival and recovery of listed species or will destroy or adversely modify the species' critical habitat. 16 U.S.C. § 1536(b). To make this determination, FWS must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of federal and nonfederal activities in the area, on the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h). FWS has a statutory duty to use the best available scientific information in an ESA consultation. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). If FWS determines that the action is likely to jeopardize the species, the biological opinion must specify "reasonable and prudent alternatives" that will avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). FWS must also formulate discretionary conservation recommendations to reduce or eliminate the action's impacts on listed species or critical habitat. 50 C.F.R. § 402.14(g)(6).

25. "[R]easonable and prudent alternatives" are alternative actions identified during formal consultation that (1) can be implemented in a manner consistent with the intended purpose of the action, (2) can be implemented consistent with the scope of the action agency's legal authority, (3) are economically and technologically feasible, and (4) would avoid the likelihood of jeopardizing the continued existence of listed species and/or avert the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.02.

26. Not only does a Section 7(a)(2) consultation assist the action agency in discharging its duty to avoid jeopardy, but the biological opinion also affects the agency's obligation to avoid "take" of listed species. Under ESA Section 9, 16 U.S.C. § 1538(a)(1)(B), it is illegal for any person—whether a private or governmental entity—to "take" any endangered species of fish or wildlife listed under the ESA. "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct." *Id*. at § 1532(19). FWS defines "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

27. As part of a consultation, FWS determines whether to authorize the take of listed species through the issuance of an incidental take statement. An incidental take statement may be issued only if the action can proceed without causing jeopardy. 16 U.S.C. § 1536(b)(4). An incidental take statement must: (1) specify the impact of the incidental take on the listed species; (2) specify "reasonable and prudent measures" the agency considers necessary to minimize that impact; and (3) set forth mandatory terms and conditions. *Id*.

28. Reasonable and prudent measures, along with terms and conditions, are nondiscretionary measures included in an incidental take statement that FWS considers necessary to minimize and reduce impacts to listed species and avoid jeopardy. *Id*.

29. An incidental take statement insulates the federal agency from liability for take of an endangered or threatened species, provided the agency complies with the statement's terms and conditions. 16 U.S.C. § 1536(o)(2). This insulation extends to any entity receiving a federal permit, license, authorization, or funding that is subject to, and in compliance with, the statement. *Id*..

**<u>Administrative Procedure Act</u>**

30. The ESA does not contain an internal standard of review, so judicial review of federal agency action is therefore governed by the Administrative Procedure Act ("APA"), 5

U.S.C. § 551 *et seq*. Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## FACTUAL BACKGROUND

**Austin Blind Salamander and Barton Springs Salamander**

31. The Austin blind salamander (*Eurycea waterlooensis*) and Barton Springs salamander (*Eurycea sosorum*)) are federally listed endangered species that depend on the Barton Springs portion of the Edwards Aquifer. The salamanders are found only in Travis County, Texas. Both are neotenic (do not transform into terrestrial form) and spend their entire lives in aquatic habitats such as springs, wet caves, and groundwater. The Austin blind salamander is thought to be more subterranean than the primarily surface-dwelling Barton Springs salamander.

32. The Edwards Aquifer is a karst aquifer characterized by open chambers, such as caves, fractures, and other cavities that were formed either directly or indirectly by the dissolution and fracturing of subsurface rock formations. The salamanders use interstitial spaces (empty voids between rocks) within the spring or streambed substrate, which provide foraging habitat and protection from predators and drought conditions.

33. The Austin blind salamander was listed as an endangered species under the ESA in 2013. 78 Fed. Reg. 51,278 (Aug. 20, 2013). The Barton Springs salamander was listed as an endangered species under the ESA in 1997. 62 Fed. Reg. 23,377 (Apr. 30, 1997).

34. Both salamander species rely on clean, well oxygenated water with substrates that are free of sediment. Changes in water quality and flow patterns can render aquatic habitat unsuitable for the salamanders. Contaminants can impact both the salamanders and their invertebrate prey base. Both salamander species are threatened by reduced habitat quality due to urbanization and increased impervious cover (paved surfaces). The normal hydrologic regime is

altered when natural vegetation and topsoil are cleared and replaced with impervious cover, which degrades water quality and quantity in the salamanders' habitat.

35. The primary threat identified in the final listing rules for both the Austin blind salamander and Barton Springs salamander is habitat modification from urban expansion, in the form of degraded water quality and quantity and disturbance of spring sites. 78 Fed. Reg. at 51,297; 62 Fed. Reg. at 23,384.

36. Salamanders from the genus *Eurycea* have been found in springs and caves near the proposed Intersections Project. Dye studies conducted by the City of Austin show there are channels of rapid subsurface flows from the Intersections Project area to Blowing Sink Cave and on to Barton Springs, providing an avenue for contaminants to reach these salamander habitats. Barton Springs salamanders are known to live in the aquifer within Blowing Sink Cave, approximately one mile east of the Intersections Project (specifically, at MoPac's intersection with Slaughter Lane).

37. The Intersections Project would reduce the quantity and quality of water recharging the Edwards Aquifer by increasing impervious cover, the probability of a hazardous material spill, and sediment pollution that would directly impact surface drainage areas and subsurface and spring salamander habitat area. These reductions in water quantity and quality and altered flows would harm the Austin blind salamander and Barton Springs salamander.

**Golden-Cheeked Warbler**

38. The golden-cheeked warbler (*Setophaga chrysoparia*) is a small insectivorous songbird that breeds only in central Texas where mature ash-juniper-oak woodlands occur. The warbler was emergency listed as an endangered species under the ESA in 1990. 55 Fed. Reg. 53,153 (Dec. 27, 1990).

39. The principal threats to the warbler and the reasons for its listing are habitat destruction, modification, and fragmentation from urbanization and some ranching practices.

40. In a five-year review of the warbler completed in 2014, the FWS explained that the warbler continues to be threatened by ongoing and imminent habitat loss and fragmentation.

41. The final listing rule for the warbler expressly calls out the need for consultation on highway projects in the warbler's habitat: "[p]rojects authorized, funded, or carried out by the Federal Highway Administration that may affect the golden-cheeked warbler, such as clearing of golden-cheeked warbler habitat … are subject to Section 7 consultation." 55 Fed. Reg. 53,159 (Dec. 27, 1990).

42. Warblers may be impacted by removal of nesting trees, removal and fragmentation of foraging habitat, and disturbance from construction activities and noise.

**TxDOT's MoPac (State Loop 1) Intersections Improvements Project**

43. The Intersections Project, as delineated by TxDOT, is an approximately two-mile long highway project in Travis County, Texas, planned as part of recent efforts to expand and extend the southern portion of the regional roadway system composed of, and linked with, Texas State Highway Loop 1. The Loop 1 roadway is commonly referred to as "MoPac," a short-hand acronymic reference to the Missouri Pacific Railroad, because the original section of the highway was built along the railroad's right-of-way.

44. MoPac has North and South sections. The Intersections Project is planned within a portion of MoPac South, which runs south for 10.2 miles, from Cesar Chavez Street to its current southern terminus point, where it links to State Highway 45 West. MoPac South has two traffic intersections, one at Slaughter Lane about eight miles from Cesar Chavez and one at La Crosse Avenue eight-tenths of a mile south of the Slaughter intersection.

45. MoPac South traverses one of the most environmentally sensitive and significant areas in the State of Texas: the recharge zone of the highly vulnerable underground waters of the Barton Springs segment of the Edwards Aquifer, upon which the endangered Barton Springs and Austin blind salamanders depend.

46. In addition to the Intersections Project, TxDOT is actively pursuing two other projects for MoPac South, including adding lanes to its northern portion, extending from Cesar Chavez Road to a half mile north of Slaughter Lane (MoPac South "Express Lanes" segment). TxDOT also plans to add lanes in the southern section of MoPac South, starting approximately

650 feet from the Intersections Project, and extend the southern terminus point roughly 3.6 miles to the recently completed FM 1626 expansion by building the designated State Highway 45 Southwest Phase I Toll Road (referred to as "SH 45 SW Phase 1").

47. The stated purpose of the Intersections Project is to provide "operational improvements" to the intersections of MoPac with Slaughter Lane and La Crosse Avenue. The Intersections Project would extend approximately two miles in length, from 2,500 feet north of Slaughter Lane to 3,700 feet south of La Crosse, adding six new travel lanes, two each way as express lanes and one each way as an additional "auxiliary" lane, with new crossing bridges over these six new lanes.

48. For a substantial part of the Intersections Project's length, TxDOT plans to dig 23 feet below grade, directly into the cave-forming Edwards Aquifer and limestone that is exposed at the surface.

49. On June 26, 2015, TxDOT completed a Biological Evaluation ("BE") in which it determined that the Intersections Project would have "no effect" on ESA-protected species and their habitats, and that therefore, consultation with FWS would not be required.

50. In December 22, 2015, TxDOT finalized an Environmental Assessment ("EA"), along with a Finding of No Significant Impact ("FONSI"), under the federal National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4351.

51. On February 19, 2016, FHWA and TxDOT published a notice of final federal agency actions for the Intersections Project, including actions taken under the ESA. 81 Fed. Reg. 8587 (Feb. 19, 2016). That notice provides that a claim seeking judicial review of the federal agency actions on the Intersections Project will be barred unless the claim is filed on or before July 18, 2016. *Id.*

52. In the EA for the Intersections Project, TxDOT explains that the Project would increase the amount of impervious cover and total suspended solid pollutant loads. As explained above, the endangered salamanders are sensitive to impervious cover and suspended solids because they require clean, clear water from the Edwards Aquifer.

53. In reaching its FONSI and "no effect" determination, TxDOT relied upon the anticipated implementation of Best Management Practices ("BMPs") associated with a Water Pollution Abatement Plan ("WPAP") required by the Texas Commission on Environmental Quality's ("TCEQ") Edwards Aquifer rules. However, there was not a project-specific WPAP included in the EA. As far as Plaintiffs are aware, TxDOT still does not have a TCEQ-approved WPAP for the Intersections Project.

54. The anticipated BMPs and water quality controls for the Intersections Project are only intended to remove 80 percent of the increase in total suspended solids. EA at 29. This assumes they are properly installed, operated, and maintained over decades into the future; however, TxDOT's track record is one of failing to operate and maintain water quality controls on MoPac over the Edwards Aquifer. In addition, the anticipated BMPs and water quality controls cannot mitigate for other water quality pollutants that are associated with highway construction and road runoff. The TCEQ rules also do not address land use, impervious cover limitations, some non-point source pollution, use of fertilizer or pesticides, or chemical spills that may result from the Intersections Project. The TCEQ rules were not designed, nor intended, to protect listed salamanders, their prey species, or their habitats.

55. In its EA, TxDOT explains roadway excavation could disrupt voids in the limestone, where endangered salamanders live. If these voids are encountered, the water quality could be impacted through introduction of silt, fuels, lubricants, and other pollutants to the subsurface, and groundwater flow may be disrupted. Rather than analyze how to prevent and mitigate the possible impacts of disrupting such key habitat of endangered salamanders, TxDOT delays creation of a mitigation plan for the impacts until after such a void is encountered.

56. Golden-cheeked warbler habitat lies within the project boundaries and surrounding zones, with approximately 7.4 acres of golden-cheeked warbler habitat occurring within the Intersections Project's footprint. It is likely that some or all of this habitat will be cleared for the Intersections Project; however, the Biological Evaluation does not assess the impacts that the project will have on these 7.4 acres.

57. The TxDOT conducted a single year of golden-cheeked warbler presence/absence surveys for the Intersections Project and concluded that the warbler is not present and therefore would not be affected by the Project. Because the warbler is a highly mobile, migratory species, its long-term use of an area cannot be properly analyzed with a single year of presence/absence surveys, which do not provide sufficient information to justify a determination that the Intersections Project will not harm the warbler or its habitats.

58. The EA and the BE contain no mention of two of TxDOT's other proposed highway projects (proposed toll road projects State Highway 45 Southwest and the MoPac South Express Lanes Project), which are adjacent to the Intersections Project and also within the recharge zone of the Barton Springs portion of the Edwards Aquifer. These three projects were devised and are undergoing evaluation at the same time, will overlap in construction time, are directed at altering operations of the same corridor, and overlap in the same geographic locale, affecting the same unique, vulnerable environmental area.[1] TxDOT did not consider the cumulative impacts the Intersections Project would have when combined with these and other projects planned in the Barton Springs Edwards Aquifer recharge zone.

59. On May 18, 2016, Plaintiffs sent Defendants a 60-day notice of intent to sue, which detailed the failure of the Biological Evaluation to support a "no effect" determination for the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler.

60. On June 21, 2016, Defendant TxDOT sent Plaintiffs a letter explaining that it modified its prior "no effect" determinations and has now determined the Intersections Project "may affect," but is "not likely to adversely affect," the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler. The letter also stated that TxDOT initiated consultation with FWS and seeks FWS's concurrence with TxDOT's determinations for the three species.

---

[1] TxDOT's failure to consider these three project segments as a single course of action subject to the National Environmental Policy Act and subject to other federal environmental requirements provide the basis for a related, currently pending action. *See Fath v. Tex. Dep't of Transp.*, No. 16-CV-234 (W.D. Tex. filed Feb. 25, 2016).

The letter did not indicate if Defendants completed a new Biological Evaluation to reach the new determination or whether there was simply a change to the conclusion.

61. Based on Plaintiffs' information and belief, Defendants have not completed consultation with FWS for the Intersections Project or implemented any measures to mitigate the impacts of the Intersections Project on endangered wildlife.

62. Consultation on a larger project that encompassed the MoPac Intersections project was originally initiated in September 2014. At that time, FHWA was still in charge of carrying out ESA responsibilities for TxDOT projects using federal funds. On September 10, 2014, the project's co-sponsor, the Central Texas Regional Mobility Authority, wrote to FWS, initiating Section 7 consultation for "the MoPac South corridor from Cesar Chavez Street to LaCrosse Avenue." These project parameters include what are now referred to separately as the MoPac Intersections Project and the MoPac South Express Lanes Project. The email identified FHWA as the action agency and requested data on listed species in the MoPac South Corridor. The email also described the surveying activities regarding listed species along the corridor.

63. This consultation initiated via this email was never completed. A few months after the September 2014 email was sent, the MOU was signed, delegating environmental review responsibilities to TxDOT. Thus, TxDOT replaced the FHWA as the action agency for purposes of Section 7 consultation. Shortly thereafter, TxDOT divided the "MoPac South corridor" project for which consultation had been initiated into two separate projects: "MoPac Intersections" and the "MoPac South Express Lanes project." TxDOT proceeded to finalize review for MoPac Intersections, but failed to follow through with the consultation process on this project.

## CAUSE OF ACTION

***(Defendants Failed to Ensure Against Jeopardy Through Completed Section 7 Consultation)***

64. Plaintiffs incorporate by reference all preceding paragraphs.

65. The Intersections Project is likely to harm the endangered Austin blind salamander and endangered Barton Springs salamander through negative impacts to water

quality and quantity and altered flow regimes in the Edwards Aquifer. The Project is also likely to harm the endangered golden-cheeked warbler through destruction and modification of its habitat, as well as disturbance from construction. These harms, when taken together with baseline conditions and impacts of other ongoing and foreseeable activities, may jeopardize the continued existence of the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, and may adversely modify the critical habitat of the Austin blind salamander.

66. Defendants have not completed consultation on impacts of the Intersections Project on the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler and have not adequately mitigated the Project's harmful impacts.

67. Defendants are therefore violating, and will continue to violate, Section 7(a)(2) of the ESA and its implementing regulations by failing to ensure through completed consultation that the Intersections Project will not jeopardize the continued existence of the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

68. The APA provides the standard of review for this claim. 5 U.S.C. § 706(2)(A). Defendants' failure to ensure against jeopardy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.*

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that Defendants have violated and are violating Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. Part 402, by failing to complete the consultation necessary to ensure that the Intersections Project is not likely to jeopardize the continued existence of the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler;

2. Order Defendants to complete the required consultation;

3. Enjoin Defendants and their agents from proceeding with implementing the Intersections Project unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

4. Award Plaintiffs their reasonable fees, costs, and expenses associated with this litigation under 16 U.S.C. § 1540(g)(4) and 28 U.S.C. § 2412; and

5. Grant Plaintiffs such other and further relief as the Court deems just and equitable.

Respectfully submitted and dated this 18th day of July, 2016:

*/s/ Jennifer L. Loda*
Jennifer L. Loda (CA Bar No. 284889)*
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810
Tel: (510) 844-7136
Fax: (510) 844-7150
jloda@biologicaldiversity.org

/s/ *Collette L. Adkins*
Collette L. Adkins (MN Bar No. 035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Tel: (651) 955-3821
Fax: (510) 844-7150
cadkins@biologicaldiversity.org

*/s/ William G. Bunch*
William G. Bunch
W.D. Tex. Bar No. 0334520

*/s/ Kelly D. Davis*
Kelly D. Davis
W.D. Tex. Bar No. 24069578
SAVE OUR SPRINGS ALLIANCE

905 W. Oltorf St., Suite A
Austin, Texas 78704
Tel: (512) 477-2320
Fax: (512) 477-6410
bill@sosalliance.org
kelly@sosalliance.org

**Attorneys for Plaintiffs**

*Seeking admission *pro hac vice*