**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **Center for Biological Diversity**, a non-profit organization; **Save Our Springs Alliance**, a non-profit organization; | ) ) ) | Case No. 1:16-cv-876 |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **AMENDED AND SUPPLEMENTAL** |
| | ) | **COMPLAINT FOR DECLARATORY** |
| **Texas Department of Transportation**; | ) | **AND INJUNCTIVE RELIEF** |
| **James Bass**, Executive Director of Texas Department of Transportation; United States Fish and Wildlife Service | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity and the Save Our Springs Alliance (collectively "Plaintiffs") challenge Defendant U.S. Fish and Wildlife Service ("FWS") and Defendant Texas Department of Transportation and its director, Defendant James Bass's (collectively "TxDOT") compliance with section 7 of the Endangered Species Act ("ESA") and its implementing regulations in their consultation on the MoPac Intersections Project ("Intersections Project") —a two-mile long highway project in Travis County.  Specifically Plaintiffs challenge the determination and concurrence of Defendant FWS that the Intersections Project is not likely to adversely affect the federally endangered Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler.  Plaintiffs also challenge the failure of Defendants TxDOT to ensure that the Intersections Project does not jeopardize the survival of Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler through its reliance on FWS's unlawful concurrence.

2.      Interagency consultation is a central feature of the ESA's framework for protecting endangered and threatened species.  Through the consultation process, federal

agencies work with expert federal wildlife agencies to ensure that their actions do not jeopardize the survival of threatened or endangered species.

3.      Through this Complaint, Plaintiffs seek injunctive and declaratory relief, including an order enjoining construction on the Intersections Project pending Defendants' full compliance with the law.

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 23 U.S.C. § 327(c)(3)(B) and Tex. Transp. Code § 201.6035 (consent to federal jurisdiction and waiver of sovereign immunity), 16 U.S.C. § 1540(g)(1)(A) (ESA citizen suit provision) and 5 U.S.C. § 702 (Administrative Procedure Act).

5.      Plaintiffs provided TxDOT with at least 60 days notice of the ESA violations alleged herein as required by 16 U.S.C. § 1540(g)(2)(A).  Defendants TxDOT have not remedied the violations set out in the 60-day written notice letters.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 16 U.S.C. § 1540(g)(3)(A) because Defendants TxDOT reside there and a substantial part of the events or omissions giving rise to the claims occurred in this district.  Defendant FWS also has an office within this district, and FWS's Austin field office sent the letter unlawfully concurring with TxDOT's conclusions

## PARTIES

7.      Plaintiff **Center for Biological Diversity** ("the Center") is a non-profit 501(c)(3) organization with more than 50,000 active members, with offices in Tucson, Arizona, and elsewhere across the country.  The Center and its members are concerned with the conservation of imperiled species—including the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler—and with the effective implementation of the ESA.

8.      The Center's members include those who have visited areas where the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler are known to occur. They use these areas to try to observe the endangered salamanders and warbler and other

wildlife; for research; for photography; for aesthetic enjoyment; and for recreational and other activities. The Center's members derive professional, aesthetic, spiritual, recreational, economic, scientific and educational benefits from these listed species and their habitats. Those members have concrete plans to continue to travel to and recreate in areas where they can try to observe the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, and they will continue to maintain an interest in these species and their habitats in the future. The Center petitioned to list the Austin blind salamander under the ESA in 2004.

9.     Plaintiff **Save Our Springs Alliance, Inc.** ("SOS") is a nonprofit charitable corporation established in 1992 to protect the land, water, and wildlife of the Edwards Aquifer region and the natural and cultural heritage of the Texas Hill Country. SOS and its members engage in a range of outdoor education, conservation-oriented research, and conservation advocacy activities—including, among others, filing written comments in the environmental study processes for the Intersections Project. SOS members regularly swim in Barton Creek and Barton Springs; hike and bike on the Barton Creek greenbelt and Lady Bird Lake trail directly below and adjacent to MoPac; and enjoy Zilker Park, Lady Bird Lake, and other parks and preserves along the MoPac South corridor. SOS members include scientists and citizen scientists who study and work to protect the endangered Barton Springs and Austin blind salamanders and golden-cheeked warbler. SOS members petitioned to list the Barton Springs salamander as endangered. One SOS member owns 385 acres adjacent to the Intersections Project and manages that property for purposes of conservation of water and wildlife.

10.     FWS's arbitrary concurrence and TxDOT's reliance on this unlawful concurrence results in a failure to ensure that the survival of the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler is not jeopardized, which has adversely affected and continues to adversely affect Plaintiffs and their members' interests.

11.     Unless the requested relief is granted, Plaintiffs' interests will continue to be adversely affected and injured by Defendants' failure to comply with the ESA and the APA, as well as the resulting harm to the Austin blind salamander, Barton Springs salamander, and

golden-cheeked warbler and their habitats if TxDOT is allowed to begin construction of the Intersections Project.  These are actual, concrete injuries from which Plaintiffs and their members presently suffer, and they are directly caused by Defendants' failure to comply with the ESA and APA and ensure the Intersections Project does not affect these listed species. Plaintiffs' injuries will be redressed by the relief sought. Plaintiffs have no other adequate remedy at law.

12.     Defendant **Texas Department of Transportation** is a state agency with principal executive offices located at 125 East Eleventh Street, Austin, Texas, 78701.  In December 2014, the State of Texas and TxDOT entered into a formal memorandum of understanding with the Federal Highway Administration ("FHWA") establishing that, for transportation-related actions that are the subject of this lawsuit, TxDOT is acting in the capacity of a federal agency, specifically as FHWA.

13.     Defendant **James Bass** is the Executive Director of TxDOT.  He is sued in his official capacity as the TxDOT Executive Director.

14.     Defendant **U.S. Fish and Wildlife Service** is an agency within the U.S. Department of the Interior. It and its officers are responsible for administering the ESA, particularly regarding potential impacts to freshwater fish and wildlife species that have been listed as threatened or endangered with extinction pursuant to the ESA

## LEGAL BACKGROUND

**Endangered Species Act**

15.     Congress enacted the ESA, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved … [and] a program for the conservation of such endangered species and threatened species …."  16 U.S.C. § 1531(b).

16.     The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior.  The Secretaries of Commerce and Interior have

delegated this responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively.

17.     When a species has been listed as threatened or endangered under the ESA, all federal agencies—including TxDOT as a delegate of FHWA—must ensure that their programs and activities are in compliance with the ESA.

18.     To this end, Section 7(a)(2) of the ESA requires that "each federal agency shall, in consultation with and with the assistance of [FWS], insure that any action authorized, funded, or carried out by such agency (hereinafter … "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by [FWS] … to be critical." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.  In fulfilling these requirements, agencies must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

19.     An agency must initiate consultation under Section 7 whenever its action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a).  Conversely, an agency is relieved of the obligation to consult on its actions only where the action will have "no effect" on listed species or designated critical habitat.  "Effects determinations" are based on the direct, indirect, and cumulative effects of the action when added to the environmental baseline and other interrelated and interdependent activities.  50 C.F.R. § 402.02 (definition of "effects of the action").

20.     The scope of agency actions subject to consultation is broadly defined to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies …."  50 C.F.R. § 402.02 (definition of "action").

21.     An agency is required to review its actions "at the earliest possible time" to determine whether an action may affect listed species or critical habitat.  50 C.F.R. § 402.14(a).  To that end, FWS is required to conclude consultations within 90 days.  16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. §§ 402.14(e).

5

22.     Section 7(d) of the ESA, 16 U.S.C. § 1536(d), provides that once a federal agency initiates consultation on an action under the ESA, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section."  The purpose of Section 7(d) is to maintain the environmental status quo pending the completion of consultation.  Section 7(d) prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligations under Section 7(a)(2) that the action will not result in jeopardy to the species or adverse modification of its critical habitat.

23.     To initiate consultation, the action agency (here, TxDOT) must assess the impacts of the action on listed species and their habitat and provide all relevant information about such impacts to the expert wildlife agency (here, FWS).  50 C.F.R. § 402.14(c)-(d).  If the action agency determines that an action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, it may undergo informal consultation with FWS, defined as "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. §§ 402.13, 402.14(b). If FWS concurs in writing with an action agency's "not likely to adversely affect" determination, the agency does not have to undergo formal consultation.  *Id*.

24.     If FWS does not concur, or if the action agency has determined that the action is "likely to adversely affect" a listed species, the agencies must conduct a formal consultation.  *Id*. at § 402.14(a).

25.     The end product of formal consultation is a biological opinion in which FWS determines whether the agency action will jeopardize the survival and recovery of listed species or will destroy or adversely modify the species' critical habitat.  16 U.S.C. § 1536(b).  To make this determination, FWS must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of federal and nonfederal activities in the

area, on the listed species.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h).  FWS has a

statutory duty to use the best available scientific information in an ESA consultation.  16 U.S.C.

§ 1536(a)(2); 50 C.F.R. § 402.14(g)(8).  If FWS determines that the action is likely to jeopardize

the species, the biological opinion must specify "reasonable and prudent alternatives" that will

avoid jeopardy.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).  FWS must also formulate

discretionary conservation recommendations to reduce or eliminate the action's impacts on listed

species or critical habitat.  50 C.F.R. § 402.14(g)(6).

26.     "[R]easonable and prudent alternatives" are alternative actions identified during

formal consultation that (1) can be implemented in a manner consistent with the intended

purpose of the action, (2) can be implemented consistent with the scope of the action agency's

legal authority, (3) are economically and technologically feasible, and (4) would avoid the

likelihood of jeopardizing the continued existence of listed species and/or avert the destruction or

adverse modification of critical habitat.  50 C.F.R. § 402.02.

27.     Not only does a Section 7(a)(2) consultation assist the action agency in

discharging its duty to avoid jeopardy, but the biological opinion also affects the agency's

obligation to avoid "take" of listed species.  Under ESA Section 9, 16 U.S.C. § 1538(a)(1)(B), it

is illegal for any person—whether a private or governmental entity—to "take" any endangered

species of fish or wildlife listed under the ESA.  "Take" is defined to mean "harass, harm,

pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct."

*Id*. at § 1532(19).  FWS defines "harm" to include "significant habitat modification or

degradation which actually kills or injures fish or wildlife by significantly impairing essential

behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50

C.F.R. § 222.102.

28.     As part of a consultation, FWS determines whether to authorize the take of listed

species through the issuance of an incidental take statement.  An incidental take statement may

be issued only if the action can proceed without causing jeopardy.  16 U.S.C. § 1536(b)(4).  An

incidental take statement must: (1) specify the impact of the incidental take on the listed species;

(2) specify "reasonable and prudent measures" the agency considers necessary to minimize that impact; and (3) set forth mandatory terms and conditions.  *Id*.

29.     Reasonable and prudent measures, along with terms and conditions, are nondiscretionary measures included in an incidental take statement that FWS considers necessary to minimize and reduce impacts to listed species and avoid jeopardy.  *Id*.

30.     An incidental take statement insulates the federal agency from liability for take of an endangered or threatened species, provided the agency complies with the statement's terms and conditions.  16 U.S.C. § 1536(o)(2).  This insulation extends to any entity receiving a federal permit, license, authorization, or funding that is subject to, and in compliance with, the statement.  *Id.*.

**Administrative Procedure Act**

31.     The APA, 5 U.S.C. § 551 *et seq*, provides for judicial review of federal agencies' and officials' compliance with the ESA and with the APA's own procedural requirements. . Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

**Austin Blind Salamander and Barton Springs Salamander**

32.     The Austin blind salamander (*Eurycea waterlooensis*) and Barton Springs salamander (*Eurycea sosorum*)) are federally listed endangered species that depend on the Barton Springs portion of the Edwards Aquifer.  The salamanders are found only in Travis County, Texas.  Both are neotenic (do not transform into terrestrial form) and spend their entire lives in aquatic habitats such as springs, wet caves, and groundwater.  The Austin blind salamander is thought to be more subterranean than the primarily surface-dwelling Barton Springs salamander.

33.     The Edwards Aquifer is a karst aquifer characterized by open chambers, such as caves, fractures, and other cavities that were formed either directly or indirectly by the dissolution and fracturing of subsurface rock formations.  The salamanders use interstitial spaces (empty voids between rocks) within the spring or streambed substrate, which provide foraging habitat and protection from predators and drought conditions.

34.     The Austin blind salamander was listed as an endangered species under the ESA in 2013.  78 Fed. Reg. 51,278 (Aug. 20, 2013).  The Barton Springs salamander was listed as an endangered species under the ESA in 1997.  62 Fed. Reg. 23,377 (Apr. 30, 1997).

35.     Both salamander species rely on clean, well oxygenated water with substrates that are free of sediment.  Changes in water quality and flow patterns can render aquatic habitat unsuitable for the salamanders.  Contaminants can impact both the salamanders and their invertebrate prey base.  Both salamander species are threatened by reduced habitat quality due to urbanization and increased impervious cover (paved surfaces).  The normal hydrologic regime is altered when natural vegetation and topsoil are cleared and replaced with impervious cover, which degrades water quality and quantity in the salamanders' habitat.

36.     The primary threat identified in the final listing rules for both the Austin blind salamander and Barton Springs salamander is habitat modification from urban expansion, in the form of degraded water quality and quantity and disturbance of spring sites.  78 Fed. Reg. at 51,297; 62 Fed. Reg. at 23,384.

37.     Salamanders from the genus *Eurycea* have been found in springs and caves near the proposed Intersections Project.  Dye studies conducted by the City of Austin show there are channels of rapid subsurface flows from the Intersections Project area to Blowing Sink Cave and on to Barton Springs, providing an avenue for contaminants to reach these salamander habitats. Barton Springs salamanders are known to live in the aquifer within Blowing Sink Cave, approximately one mile east of the Intersections Project (specifically, at MoPac's intersection with Slaughter Lane).

38.     The Intersections Project would reduce the quantity and quality of water recharging the Edwards Aquifer by increasing impervious cover, the probability of a hazardous material spill, and sediment pollution that would directly impact surface drainage areas and subsurface and spring salamander habitat area.  These reductions in water quantity and quality and altered flows would harm the Austin blind salamander and Barton Springs salamander.

**Golden-Cheeked Warbler**

39.     The golden-cheeked warbler (*Setophaga chrysoparia*) is a small insectivorous songbird that breeds only in central Texas where mature ash-juniper-oak woodlands occur.  The warbler was emergency listed as an endangered species under the ESA in 1990.  55 Fed. Reg. 53,153 (Dec. 27, 1990).

40.     The principal threats to the warbler and the reasons for its listing are habitat destruction, modification, and fragmentation from urbanization and some ranching practices.

41.     In a five-year review of the warbler completed in 2014, the FWS explained that the warbler continues to be threatened by ongoing and imminent habitat loss and fragmentation.

42.     The final listing rule for the warbler expressly calls out the need for consultation on highway projects in the warbler's habitat: "[p]rojects authorized, funded, or carried out by the Federal Highway Administration that may affect the golden-cheeked warbler, such as clearing of golden-cheeked warbler habitat … are subject to Section 7 consultation."  55 Fed. Reg. 53,159 (Dec. 27, 1990).

43.     Warblers may be impacted by removal of nesting trees, removal and fragmentation of foraging habitat, and disturbance from construction activities and noise.

**TxDOT's MoPac (State Loop 1) Intersections Improvements Project**

44.     The Intersections Project, as delineated by TxDOT, is an approximately two-mile long highway project in Travis County, Texas, planned as part of recent efforts to expand and extend the southern portion of the regional roadway system composed of, and linked with, Texas State Highway Loop 1.  The Loop 1 roadway is commonly referred to as "MoPac," a short-hand

acronymic reference to the Missouri Pacific Railroad, because the original section of the highway was built along the railroad's right-of-way.

45.     MoPac has North and South sections.  The Intersections Project is planned within a portion of MoPac South, which runs south for 10.2 miles, from Cesar Chavez Street to its current southern terminus point, where it links to State Highway 45 West.  MoPac South has two traffic intersections, one at Slaughter Lane about eight miles from Cesar Chavez and one at La Crosse Avenue eight-tenths of a mile south of the Slaughter intersection.

46.     MoPac South traverses one of the most environmentally sensitive and significant areas in the State of Texas: the recharge zone of the highly vulnerable underground waters of the Barton Springs segment of the Edwards Aquifer, upon which the endangered Barton Springs and Austin blind salamanders depend.

47.     In addition to the Intersections Project, TxDOT is actively pursuing two other projects for MoPac South, including adding lanes to its northern portion, extending from Cesar Chavez Road to a half mile north of Slaughter Lane (MoPac South "Express Lanes" segment). TxDOT also plans to add lanes in the southern section of MoPac South, starting approximately 650 feet from the Intersections Project, and extend the southern terminus point roughly 3.6 miles to the recently completed FM 1626 expansion by building the designated State Highway 45 Southwest Phase I Toll Road (referred to as "SH 45 SW Phase 1").

48.     The stated purpose of the Intersections Project is to provide "operational improvements" to the intersections of MoPac with Slaughter Lane and La Crosse Avenue.  The Intersections Project would extend approximately two miles in length, from 2,500 feet north of Slaughter Lane to 3,700 feet south of La Crosse, adding six new travel lanes, two each way as express lanes and one each way as an additional "auxiliary" lane, with new crossing bridges over these six new lanes.

49.     For a substantial part of the Intersections Project's length, TxDOT plans to dig 23 feet below grade, directly into the cave-forming Edwards Aquifer and limestone that is exposed at the surface.

50.     On June 26, 2015, TxDOT completed a Biological Evaluation ("BE") in which it determined that the Intersections Project would have "no effect" on ESA-protected species and their habitats, and that therefore, consultation with FWS would not be required.

51.     In December 22, 2015, TxDOT finalized an Environmental Assessment ("EA"), along with a Finding of No Significant Impact ("FONSI"), under the federal National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4351.

52.     On February 19, 2016, FHWA and TxDOT published a notice of final federal agency actions for the Intersections Project, including actions taken under the ESA.  81 Fed. Reg. 8587 (Feb. 19, 2016).  That notice provides that a claim seeking judicial review of the federal agency actions on the Intersections Project will be barred unless the claim is filed on or before July 18, 2016.  *Id.*

53.     In the EA for the Intersections Project, TxDOT explains that the Project would increase the amount of impervious cover and total suspended solid pollutant loads.  As explained above, the endangered salamanders are sensitive to impervious cover and suspended solids because they require clean, clear water from the Edwards Aquifer.

54.     In reaching its FONSI and "no effect" determination, TxDOT relied upon the anticipated implementation of Best Management Practices ("BMPs") associated with a Water Pollution Abatement Plan ("WPAP") required by the Texas Commission on Environmental Quality's ("TCEQ") Edwards Aquifer rules.  However, there was not a project-specific WPAP included in the EA.

55.     The anticipated BMPs and water quality controls for the Intersections Project are only intended to remove 80 percent of the increase in total suspended solids. EA at 29.  This assumes they are properly installed, operated, and maintained over decades into the future; however, TxDOT's track record is one of failing to operate and maintain water quality controls on MoPac over the Edwards Aquifer.  In addition, the anticipated BMPs and water quality controls cannot mitigate for other water quality pollutants that are associated with highway construction and road runoff.  The TCEQ rules also do not address land use, impervious cover

12

limitations, some non-point source pollution, use of fertilizer or pesticides, or chemical spills that may result from the Intersections Project. The TCEQ rules were not designed, nor intended, to protect listed salamanders, their prey species, or their habitats.

56.     In its EA, TxDOT explains roadway excavation could disrupt voids in the limestone, where endangered salamanders live. If these voids are encountered, the water quality could be impacted through introduction of silt, fuels, lubricants, and other pollutants to the subsurface, and groundwater flow may be disrupted. Rather than analyze how to prevent and mitigate the possible impacts of disrupting such key habitat of endangered salamanders, TxDOT delays creation of a mitigation plan for the impacts until after such a void is encountered.

57.     Golden-cheeked warbler habitat lies within the project boundaries and surrounding zones, with approximately 7.4 acres of golden-cheeked warbler habitat occurring within the Intersections Project's footprint. It is likely that some or all of this habitat will be cleared for the Intersections Project; however, the Biological Evaluation does not assess the impacts that the project will have on these 7.4 acres.

58.     The TxDOT conducted a single year of golden-cheeked warbler presence/absence surveys for the Intersections Project and concluded that the warbler is not present and therefore would not be affected by the Project. Because the warbler is a highly mobile, migratory species, its long-term use of an area cannot be properly analyzed with a single year of presence/absence surveys, which do not provide sufficient information to justify a determination that the Intersections Project will not harm the warbler or its habitats.

59.     The EA and the BE contain no mention of two of TxDOT's other proposed highway projects (proposed toll road projects State Highway 45 Southwest and the MoPac South Express Lanes Project), which are adjacent to the Intersections Project and also within the recharge zone of the Barton Springs portion of the Edwards Aquifer. These three projects were devised and are undergoing evaluation at the same time, will overlap in construction time, are directed at altering operations of the same corridor, and overlap in the same geographic locale,

affecting the same unique, vulnerable environmental area.[1]  TxDOT did not consider the cumulative impacts the Intersections Project would have when combined with these and other projects planned in the Barton Springs Edwards Aquifer recharge zone.

60.     Consultation on a larger project that encompassed the MoPac Intersections Project was originally initiated in September 2014.  At that time, FHWA was still in charge of carrying out ESA responsibilities for TxDOT projects using federal funds.  On September 10, 2014, the project's co-sponsor, the Central Texas Regional Mobility Authority, wrote to FWS, initiating Section 7 consultation for "the MoPac South corridor from Cesar Chavez Street to LaCrosse Avenue."  These project parameters include what are now referred to separately as the MoPac Intersections Project and the MoPac South Express Lanes Project.  The email identified FHWA as the action agency and requested data on listed species in the MoPac South Corridor.  The email also described the surveying activities regarding listed species along the corridor.

61. The consultation initiated via this email was never completed.  A few months after the September 2014 email was sent, a Memorandum of Understanding  was signed, delegating federal environmental review responsibilities to TxDOT.  Thus, TxDOT replaced the FHWA as the action agency for purposes of Section 7 consultation.  Shortly thereafter, TxDOT divided the "MoPac South corridor" project for which consultation had been initiated into two separately studied projects:  "MoPac Intersections" and the "MoPac South Express Lanes project."

62.     On May 18, 2016, Plaintiffs sent TxDOT a 60-day notice of intent to sue, which detailed the failure of the Biological Evaluation to support a "no effect" determination for the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler.

63.     On June 21, 2016, Defendant TxDOT sent Plaintiffs a letter explaining that it modified its prior "no effect" determinations and has now determined the Intersections Project "may affect," but is "not likely to adversely affect," the Austin blind salamander, Barton Springs

---

[1] TxDOT's failure to consider these three project segments as a single course of action subject to the National Environmental Policy Act and subject to other federal environmental requirements provide the basis for a related, currently pending action.  *See Fath v. Tex. Dep't of Transp.*, No. 16-CV-234 (W.D. Tex. filed Feb. 25, 2016).

salamander, or golden-cheeked warbler.  The letter also stated that TxDOT initiated consultation with FWS and seeks FWS's concurrence with TxDOT's determinations for the three species. The letter did not indicate if TxDOT completed a new Biological Evaluation to reach the new determination or whether there was simply a change to the conclusion.

64.     On July 13, 2016, FWS sent an email to TxDOT stating that the agency was not able to concur with TxDOT's may affect, not likely to adversely affect determination and that, rather than issue a non-concurrence letter, FWS wanted to meet with TxDOT to discuss concerns and determine if a concurrence could be reached with the implementation of additional conservation measures.  The email also summarized FWS's remaining concerns related to potential affects to the Austin blind salamander and Barton Springs salamander, including concerns that proposed water quality standards may not be met during project implementation and operation, and FWS's belief that some form of monitoring is necessary to determine a threshold for reinitiation if the proposed total suspended solids ("TSS") levels are not being attained or other contaminants are not being captured.  The letter also details concerns about the likelihood of encountering new recharge features during construction and indicates that, under TxDOT's proposal, if a new recharge feature is encountered during construction TxDOT would have to stop construction and reinitiate consultation with FWS.

65.     On July 28, 2016 TxDOT submitted a status report to the Court in the case *Fath v. Tex. Dep't of Transp.*, in which it disclosed that AT&T had begun utility relocation work at the Intersections Project on May 23, 2016. No. 16-CV-234 (W.D. Tex. filed Feb. 25, 2016).  The report discloses that in the course of the excavation of two bore pits for utility relocation one of the bore holes collapsed and AT&T excavated a pit to recover the bore reamer.  The status report did not indicate whether a Section 10(A)(1)(a) permitted scientist inspected the site to evaluate the potential for species habitat, as called for in the Final EA for the Intersections Project.  Final EA at 29.  On information and belief, FWS was not immediately informed of the collapse of this bore pit nor the subsequent excavation of a pit to recover the bore reamer.  The status report discloses that TxDOT's General Counsel Division did not learn of AT&T's work on the

Intersections Project site until July 19, 2016, and after discussing the matter with TxDOT's Environmental Division and District Engineer for the Austin District, concluded the work should be stopped. As of July 22, 2016 AT&T had stopped work, filled in all excavations, and laid down erosion control matting and seeding.

66.     On September 7, 2016 FWS sent an additional email to TxDOT with an attached letter that stated that the informal consultation request documentation for the Intersections Project did not include the information FWS needed to move forward with consultation, and providing recommendations for revising their submission to FWS. The letter stated that it would greatly help FWS if TxDOT's evaluation was based upon the best available scientific information, with citations to that information, including the significant amount of research available on how water quality degradation may affect the salamanders. FWS asked TxDOT to provide this information, as well as any relevant information that may not support TxDOT's decision. The letter explained that TxDOT should provide information that may run counter to their position in order to allow FWS to make a well-reasoned and comprehensive decision in the course of the consultation. The letter also detailed a non-exclusive list of FWS's concerns including, but not limited to: TSS is the only contaminant addressed in the consultation document, even though it is not the only one that can affect water quality for the salamanders; no justification provided in the documents as to why the increase in impervious cover would not affect the salamanders; and TxDOT's Geology Study contains numerous flaws and includes findings that are contradicted by other information in the documents or by existing science. The letter asks TxDOT to revise the Geology Study to comply with the requirements in FWS's Consultation Handbook. The letter also states that TxDOT should provide a scientific basis for not addressing small voids and document why its void mitigation measures would result in insignificant or discountable effects on salamanders, since once a void is uncovered it may be too late to prevent adverse effects from occurring. The letter also directed TxDOT to break down the project into direct effects and indirect effects, and to evaluate and discuss interrelated actions and interdependent effects, such as relocation of utility lines.

67. On September 21, 2016 FWS sent a letter to the Federal Highway Administration ("FHWA") as part of FHWA's audit of its National Environmental Policy Act ("NEPA") Assignment to TxDOT.  The letter states that FWS has concerns regarding TxDOT's compliance with required coordination with FWS under NEPA and ESA, based on their assignment and Memorandum of Understanding with FHWA.  Specifically, the letter states that TxDOT's intra-agency memorandums intended to provide guidance on environmental consultation procedures are in conflict with FWS's consultation requirements, as described in the ESA and FWS's Consultation Handbook.  For example, one such memo discussed in the letter is in regards to the golden-cheeked warbler, which apparently states that a "no effect" determination is appropriate when no habitat is being directly affected, based on results of noise studies conducted at road construction projects.  In the letter FWS expresses that this is an incorrect interpretation based on problems with the study design and analysis and its focus on noise as the only factor that could affect the warblers, without considering other potential effects such as vibration, lighting, and increased activity levels.  The letter expresses FWS's concern that TxDOT is not in full compliance with the requirements of its NEPA Assignment responsibilities.  The letter states that FWS has repeatedly reminded TxDOT of its obligation to protect listed species from extinction and to give listed species the benefit of the doubt when effects are difficult to determine; however, FWS does not believe this is being consistently applied by TxDOT.   The letter also states that in several cases where FWS has disagreed with TxDOT's "may affect, not likely to adversely affect" determination and recommended TxDOT formally consult, TxDOT has responded by arguing that FWS could not prove take would occur or threatening to proceed with the project without FWS's concurrence.

68.    On October 27, 2016 TxDOT sent a letter to FWS to supplement their consultation discussion regarding the Intersections Project.  The letter reiterated TxDOT's determination that the Intersections Project is not likely to adversely affect the Austin blind salamander and the Barton Springs salamander and will not have an adverse effect on critical habitat for the Austin blind salamander.  The letter states that TxDOT would like to retract any

17

reference to the Biological Studies Technical Memorandum cited in their June 17, 2016 letter, given the need to update it.  The letter indicates that there has been a great deal of research on water quality within the Barton Springs segment of the Edwards Aquifer and that TxDOT reviewed these studies and found none that made a connection between highway construction or operation on the Recharge Zone and a "specific effect" on the Barton Springs salamander or Austin blind salamander.  Barrett (2016) is the only water quality report specifically cited to in the letter, with an indication that a copy of the draft report is included with the letter as Attachment L.  The letter also states that it is intended to provide clarification regarding the project's action area based on the direct and indirect effects and a discussion of any interrelated and interdependent effects.  TxDOT identifies relocation of underground utilities owned by others as an interdependent action of the Intersections Project.  The letter includes a list of voluntary conservation measures that TxDOT intends to implement, which are almost identical to the list of measures TxDOT originally offered in its June 17, 2016 letter.  The letter states that once completed the Intersections Project will improve the quality of storm water runoff, as measured by total suspended solids ("TSS"), compared to pre-project conditions.  The letter states that TSS represents a useful surrogate for other potential contaminants and thus a reduction in TSS would generally indicate a reduction in most other contaminants that would be present in stormwater runoff.

69.     On January 31, 2017 TxDOT sent FWS an email with an attached document, stating that it was put together to address some of what they had heard from FWS during a site visit, regarding the effectiveness of temporary best management practices ("BMPs") during construction.  The attached document, entitled "Effectiveness of Temporary Erosion and Sedimentation Controls on the MoPac Intersections Project," was later cited in FWS's letter of concurrence, and contains details about temporary BMPs to be installed to control storm water runoff.  The document states that six permanent detention ponds will be used for temporary sedimentation purposes during construction.  The document states that additional sediment traps will be added as needed and will be determined by the contractor, but did not include any

information about how this need would be monitored nor did it set a trigger point at which additional traps would be added.  The document also states that the effectiveness of temporary construction BMPs is difficult to quantify and that continually changing construction site conditions, along with other factors, make it virtually impossible to estimate what level of effectiveness of sediment control will be achieved during the construction of a project.

70.     On February 3, 2017 TxDOT sent FWS a letter in response to FWS's desire for clarification on some specific items that were previously submitted to FWS for this consultation. The letter says that despite TxDOT's earlier request that the Biological Studies Technical Memorandum be retracted, the document may be referenced for background information and assessment of conditions, but asks FWS to disregard mention of  conclusions related to "effect" as TxDOT's effect determinations have been updated per their June 2016 consultation letter.

71.     On March 27, 2017 TxDOT sent FWS an email in response to questions raised in a meeting on March 20, 2017, primarily focused on spills during and after construction such as the likelihood of spills, TxDOT's process for responding to spills, and the ability of contractors to handle spills during construction.

72.     On March 31, 2017 Plaintiffs sent TxDOT a supplemental 60-day notice of intent to sue, which detailed the potential for violations of Sections 7(d) and 9 of the ESA if construction is begun on the Intersections Project without fulfilling the ESA's consultation requirements.  Shortly after this notice was sent, TxDOT agreed to jointly move to stay the case and to not start construction for the duration of the stay.

73.     On June 2, 2017 TxDOT sent an email to FWS in response to additional requests for clarification about the status of the Water Pollution Abatement Plan, the fate of excavated material, and plans for the use of herbicides in the project area.

74.     On June 23, 2017 FWS sent TxDOT a letter in which it concurred with TxDOT's determination that the Intersections Project may affect, but is not likely to adversely affect the golden-cheeked warbler, Austin blind salamander, or the Barton Springs salamander and that there will be no adverse modification of designated critical habitat for the Austin blind

salamander. The letter includes a list of conservation measures that TxDOT has incorporated into the Intersections Project to minimize or avoid effects to these endangered species or their habitat. This list is almost identical to the lists of conservation measures included in TxDOT's June 17, 2016 and October 27, 2016 letters.

## FIRST CLAIM FOR RELIEF

### *(FWS's Letter of Concurrence is Arbitrary, Capricious, and Violates the ESA)*

75.     Plaintiffs incorporate by reference all preceding paragraphs.

76.     On June 23, 2017 FWS concurred with TxDOT's determination that the Intersections Project was not likely to adversely affect the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, or adversely modify the critical habitat of the Austin blind salamander.

77.     In concurring with TxDOT's determination for the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, FWS failed to rationally consider and explain a number of relevant factors, including but not limited to the potential impacts of void encounters on the endangered salamanders, the broad range of likely pollutants other than total suspended solids, additional impacts of highway projects currently being planned or constructed in the Barton Springs recharge zone, and the available scientific evidence regarding effectiveness of sediment controls and impacts of impervious cover on the endangered salamanders.

78.     Because FWS concurred with TxDOT's "not likely to adversely affect" determination for the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, no biological opinion was prepared for the Intersections Project, and therefore no incidental take statement was prepared that would have required that impacts to these species be minimized through mandatory terms and conditions, and which would have included monitoring and reporting requirements. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

79.     An FWS concurrence that a proposed action is not likely to adversely affect listed species, or is not likely to destroy or adversely modify critical habitat, is final agency action reviewable under Section 706(2)(A) of the APA.

80.     FWS's letter of concurrence that the Intersections Project is not likely to adversely affect the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, or the Austin blind salamander's critical habitat is arbitrary, capricious, an abuse of discretion, and in violation of Section 7 of the ESA.  5 U.S.C. § 706(2)(A). The FWS letter of concurrence should be held unlawful and set aside.  *Id.* at § 706(2).

## SECOND CLAIM FOR RELIEF

*(TxDOT Failed to Ensure Against Jeopardy Through Reliance on FWS's Arbitrary and Capricious  Concurrence)*

81.     Plaintiffs incorporate by reference all preceding paragraphs.

82.     The Intersections Project is likely to harm the endangered Austin blind salamander and endangered Barton Springs salamander through negative impacts to water quality and quantity and altered flow regimes in the Edwards Aquifer.  The Project is also likely to harm the endangered golden-cheeked warbler through destruction and modification of its habitat, as well as disturbance from construction.  These harms, when taken together with baseline conditions and impacts of other ongoing and foreseeable activities, may jeopardize the continued existence of the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, and may adversely modify the critical habitat of the Austin blind salamander.

83.     TxDOT did not properly consider the impacts of the Intersections Project on the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler in their "not likely to adversely affect" determination and TxDOT has not adequately mitigated the Project's harmful impacts.

84.     Rather than take measures to avoid jeopardy of these endangered species through formal consultation with FWS, TxDOT unreasonably relied on FWS's unlawful concurrence .

85.     TxDOT is therefore violating, and will continue to violate, Section 7(a)(2) of the ESA and its implementing regulations by failing to ensure that the Intersections Project will not jeopardize the continued existence of the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler.  16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

86.     The APA provides the standard of review for this claim.  5 U.S.C. § 706(2)(A). TxDOT's failure to ensure against jeopardy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.*

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that Defendant FWS violated the APA and ESA by arbitrarily and capriciously concurring in TxDOT's "not likely to adversely affect" determination for the Austin blind salamander, Barton Springs salamander, and golden-cheeked warbler, and critical habitat for Austin blind salamander.

2.     Declare that Defendants TxDOT have violated and are violating Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. Part 402, by failing to ensure that the Intersections Project does not jeopardize the continued existence of the Austin blind salamander, Barton Springs salamander, or golden-cheeked warbler;

3.     Order Defendants to comply with the ESA and APA;

4.     Set aside Defendant FWS's June 2017 ESA concurrence for the Intersections Project.

5.     Enjoin Defendants TxDOT and their agents from proceeding with implementing the Intersections Project unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

6.     Award Plaintiffs their reasonable fees, costs, and expenses associated with this litigation under 16 U.S.C. § 1540(g)(4) and 28 U.S.C. § 2412; and

7.     Grant Plaintiffs such other and further relief as the Court deems just and equitable.

Respectfully submitted and dated this 25th day of July, 2017:


_____*/s/ Jennifer L. Loda*_____
Jennifer L. Loda (CA Bar No. 284889)*
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810
Tel: (510) 844-7136
Fax: (510) 844-7150
jloda@biologicaldiversity.org


_____/s/ *Collette L. Adkins*_____
Collette L. Adkins (MN Bar No. 035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Tel: (651) 955-3821
Fax: (510) 844-7150
cadkins@biologicaldiversity.org


_____*/s/ William G. Bunch*_____
William G. Bunch
W.D. Tex. Bar No. 0334520


_____*/s/ Kelly D. Davis*_____
Kelly D. Davis
W.D. Tex. Bar No. 24069578
SAVE OUR SPRINGS ALLIANCE
905 W. Oltorf St., Suite A
Austin, Texas 78704
Tel: (512) 477-2320
Fax: (512) 477-6410
bill@sosalliance.org
kelly@sosalliance.org

**Attorneys for Plaintiffs**

*Seeking admission *pro hac vice*

23